UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT C... ... ...
★ DEC 21, 2009
P.M.
TIME A.M.

--------------------------------------------------------------------x

JOHN RIVERA,

                       Petitioner,

        -against-

ANDREW CUOMO, NEW YORK STATE ATTORNEY
GENERAL, and JOSEPH SMITH, SUPERINTENDENT,
SHAWANGUNK CORRECTIONAL FACILITY,[1]

                       Respondents.

**MEMORANDUM and ORDER**

05-CV-1699 (SLT) (JMA)

--------------------------------------------------------------------x

**TOWNES, United States District Judge:**

        Petitioner John Rivera petitions this Court for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, challenging his September 19, 1997, conviction for murder in the second degree

under a depraved indifference theory (N.Y. Penal Law § 125.25(2)). Petitioner argues that the

evidence adduced at trial was insufficient to support his conviction on charges of depraved

indifference murder because "all of the evidence went to a theory of intentional conduct."

Petitioner's Memorandum of Law in Support of Petition at 37. For the reasons stated below, the

evidence was sufficient to prove his guilt of depraved indifference murder at the time of

petitioner's conviction. Accordingly, petitioner's application for a writ of habeas corpus is

denied and this action is dismissed.

### BACKGROUND

        On January 13, 1997, at approximately 10:00 p.m., Kimberly Cassas Rivera ("Rivera"), a

New York City police officer assigned to the 68th Precinct, suffered a single gunshot to the head,

---

       [1]This action was originally brought against Eliot Spitzer in his capacity as Attorney
General of the State of New York. By operation of Fed. R. Civ. P. 25(d), Andrew Cuomo was
automatically substituted as a party to this action when he succeeded Mr. Spitzer as Attorney
General.



fired from a Beretta semiautomatic pistol which was in contact with her temple. Although there was some evidence from eyewitnesses suggesting that the shooting might have been a suicide, petitioner – her estranged husband – was ultimately indicted on two charges of murder in the second degree – under both intentional murder (N.Y. Penal Law § 125.25(1)) and depraved indifference theories – and other, lesser charges. In the summer of 1997, petitioner went to trial on the charges before Justice L. Priscilla Hall in the Supreme Court of the State of New York, Kings County.

### *The Evidence at Trial*

The evidence adduced at trial provided a complete history of Rivera's short, but tumultuous, marriage to petitioner. According to Rivera's sister, Stephanie Cassas ("Cassas"), and her mother, Marlene Cassas ("Mrs. Cassas"), petitioner and Rivera began dating sometime in the summer of 1983. They broke up for about a year, but resumed dating in June 1994. They married about six weeks later, in August 1994, while on vacation together in South Carolina. No relatives were invited. Indeed, Rivera's mother and sister did not even learn that Rivera had wed until more than a month later, when Rivera's former boyfriend told Mrs. Cassas. Upon returning to Brooklyn, the couple continued to live apart, petitioner in a basement apartment at 123 Bay 11th Street and Rivera at the house she and her mother owned at 2167 83rd Street.

Although he worked for the New York City Transit Authority at the time he married Rivera, petitioner was a so-called "badge buff" and had friends who were police officers. One such friend was John Dellasalla, a police officer who shared petitioner's interest in weightlifting and motorcycles. Through Dellasalla, petitioner met Ralph Jones, who was then one of

Dellasalla's fellow police officers in the 50th Precinct. Although Jones was "much better friends with Dellasalla" than he was with petitioner (Jones: 231),[2] the three men socialized together.

In 1988 or 1989, Dellasalla left the police department to join the fire department. Unable to legally keep the four pistols he owned, Dellasalla transferred possession of the firearms to Jones who, as a police officer, could legally possess them. These weapons included the Beretta semiautomatic pistol which caused Rivera's death.

About one and one-half years after leaving the police department, Dellasalla was killed in a motorcycle accident. Sometime thereafter, petitioner telephoned Jones to ask if he could have Dellasalla's Beretta. Jones informed petitioner that he could not transfer ownership of the gun to him because he was not licensed.

Petitioner's marriage to Rivera, a police officer, afforded petitioner the opportunity to obtain the Beretta. In late August 1994, petitioner called Jones, informed him of his marriage, and told Jones he wanted the Beretta for his wife. Jones agreed to transfer ownership of the weapon to Rivera, and arranged to have petitioner and Rivera visit City Hall – where Jones then worked – on August 26, 1994, to effectuate the transfer. According to Jones, when he transferred the gun, it had rubber grips on the handle and was in a box containing the original wooden grips and an extra magazine.

The relationship between petitioner and Rivera soured after the birth of their son, Michael, on May 8, 1995. Although Cassas observed arguments between petitioner and Rivera over the manner in which Rivera was caring for herself during the pregnancy, she testified that

---

[2]Numbers in parentheses refer to pages in the trial transcript. Names preceding the numbers denote the witness whose testimony appears on that page.

petitioner became "more possessive about [Rivera's] whereabouts" after the baby was born (Cassas: 377). At trial, Cassas recalled that the couple engaged in loud, angry arguments over the telephone "at least once a day" (*Id.*).

According to Police Officer Jeanette Oreckinto, a domestic violence officer at the 62nd Precinct, the relationship had become violent by sometime in August 1995. That month, Rivera consulted an attorney, Lynn Lewis, about obtaining a divorce. Lewis was already acquainted with Rivera, having played on a flag football team that Rivera helped to coach. Lewis not only drafted divorce papers, but obtained an order of protection from Family Court which required petitioner to "stay away from ... Rivera, ... her home and ... her place of employment" (484). Both the divorce papers and the order of protection were served on petitioner on September 2, 1995.

Six days later, on September 8, 1995, Rivera was walking her dogs in a park with Michael and her friend, Ellen Morck, when petitioner arrived on his motorcycle. According to Morck, petitioner started "yelling and screaming about ... want[ing] to see the baby" before he even dismounted (273). Although Rivera reminded him that she had an order of protection and asked him to leave, petitioner approached Michael's stroller, screaming and cursing. When Rivera blocked his path, placing her body between petitioner and the stroller, petitioner grabbed Rivera by the throat and flung her to the ground.

As petitioner attempted to unfasten the straps which held Michael in the stroller, Rivera jumped up, shoved him away with both hands, and again interposed her body between petitioner and the stroller. According to Morck, petitioner continued to scream at Rivera for "about 20 minutes" before he actually left (283). However, while petitioner, at 200 pounds, enjoyed a

4

considerable size advantage over the 135-pound Rivera, petitioner made no further efforts to force his way to the stroller.

Petitioner filed a criminal complaint in connection with this incident. At about the same time, the NYPD's Internal Affairs Bureau ("IAB") began investigating allegations that Rivera had failed to safeguard the Beretta. On September 21, 1995, while awaiting the start of a proceeding in Family Court, petitioner approached Lewis and proposed a deal: he would return "the gun" if Rivera agreed to drop the criminal charges against him and to discontinue the divorce proceedings. Although Lewis claimed at trial that she already knew what gun petitioner meant, she testified that she nonetheless asked, "What gun?" (859). According to Lewis, petitioner responded, "[T]he gun that I took from Kimberly's house, a Beretta" (859). Lewis then told petitioner, "You have the gun appear on my doorstep and then I will talk to my client" (860). The deal was never consummated.

Sometime in the Fall of 1995, petitioner and Rivera worked out a child custody arrangement, under which petitioner was permitted supervised visitation four hours per week. Although the visitations were originally scheduled for alternating Sundays and Tuesdays, the schedule was soon rearranged to provide for visits every Sunday afternoon. Rivera agreed to have Angela Cerrato, the mother of one of petitioner's friends, supervise the visits at Cerrato's home. Although petitioner himself performed most of the childcare duties during these visits, Rivera emphasized to Cerrato that she was never to leave petitioner alone with the baby.

During these visitations, Cerrato observed arguments between petitioner and Rivera which she characterized at trial as a "clash of the titans" (1378). On one or more occasions, Cerrato heard petitioner threaten to kill Rivera. However, Cerrato, who testified that petitioner

became "very angry when he was denied his right to see his son" (1387), opined that the threat(s) were made in anger, and without "malice" (1385).

Cerrato was not the only one to hear petitioner threaten to kill Rivera. Mrs. Cassas testified that she had heard petitioner threaten to kill Rivera and her dogs "[m]ore than four times" around November 1995 (511). In addition, Carmen Sepulveda, a tenant in the house that Rivera owned with her mother, testified at length concerning a death threat that petitioner allegedly left on Rivera's telephone answering machine.

Sepulveda, who occupied a room adjacent to Rivera's bedroom and claimed that she was able to overhear messages left on Rivera's answering machine, testified that petitioner called Rivera repeatedly on a day in early December 1995, leaving profane messages demanding that she answer the telephone. Rivera was upstairs with the baby and did not answer. Finally, petitioner left a message threatening to come over and kill Rivera.

According to Sepulveda, petitioner arrived at Rivera's house about two minutes after making that threat. Rivera refused to let him in, but spoke with him through an open window. At trial, Sepulveda recalled that petitioner said, "[I]f you don't open the door I'm going to break the window door [*sic*] and then it's going to be trouble" (1096). When Rivera still refused to admit him and threatened to call the police, petitioner broke a window in the front door.

Petitioner never gained entry, but remained at the scene until police officers arrived and told him to leave. Sepulveda claimed that the officers called petitioner by his first name and seemed "friendly," telling him that he knew "the system" and should go to Family Court (1161). Apparently, no charges were ever filed. At trial, Oreckinto – the domestic violence officer assigned to Rivera's case – was unaware that any such incident had occurred.

6

Paul Schumacher, a "job superintendent" for a construction company which occasionally employed petitioner as an unskilled day laborer during the period between October or November 1995 and January 1996, also heard threats. According to Schumacher, petitioner was "constantly talking about his wife" to anybody who would listen, but "had pretty much nothing nice to say" about her (1022-23). He called Rivera filthy names; said he hated her, her mother, her sister and her dogs; and "wished death" on her on "dozens" of occasions (1025).

Petitioner not only threatened Rivera but, according to Cassas, threatened her as well following an incident on Sunday, January 7, 1996. There was a severe snowstorm that day, and petitioner telephoned Rivera's house at around 3:00 or 3:30 that afternoon to report that he and Cerrato were having difficulty returning Michael from the weekly visitation. After a lengthy journey, in which the car service vehicle in which he and Cerrato were riding became inoperable, forcing petitioner to continue alone on foot, petitioner arrived at Rivera's house shortly before 4:30 p.m. Finding the front door unlocked, as usual, petitioner entered the house unannounced, took the baby to Rivera's room, and proceeded to take off the baby's snowsuit.

Alerted by the sound of Rivera's dogs barking, Cassas found petitioner sitting on Rivera's bed with the baby at about 4:30 p.m. Aware that petitioner was not permitted to come near the house, Cassas confronted him, demanding to know what he was doing there and screaming at him to "get the 'F' out of this house" (391). Petitioner yelled back, saying, *inter alia*, that she and her family would not keep him from seeing his son and threatening: "I'll kill you before I let you take my son away from me" (391).

Despite these threats, Rivera herself may have violated the order of protection and child custody arrangements on occasion. According to Carol Stearin, CSW, a psychotherapist with

whom Rivera had seven sessions between August 31 and November 7, 1995, Rivera had "some difficult feelings around ... getting a divorce" (1316). In particular, she felt "sorry that Michael ... wouldn't ... get to know his father, or experience being with his father" (1327). As a result, Rivera would occasionally accede to petitioner's demands to see the baby or to see her, even though this was in violation of court orders (1328).

Stearin's testimony was corroborated to some degree by Oreckinto, who testified about an accident report that had been issued in connection with a November 5, 1995, motorcycle accident involving petitioner. That report indicated that Rivera was present at the scene of the accident. According to Cassas, Rivera visited petitioner in the hospital. In addition, Oreckinto recalled that Rivera had visited the 62nd Precinct to collect a copy of the accident report.

### The Events Immediately Preceding the Incident

In the second week of January 1996, Cerrato went on vacation to Aruba. Since there was no one to supervise visitation, petitioner's weekly visitation with Michael – which would have ordinarily taken place on January 14, 1996 – could not occur. Cassas recalled that Rivera told her that petitioner was "very upset" by this development, and had been "bothering her about [it] the whole week" (394).

Two things went wrong for petitioner on Friday, January 12, 1996. First, Schumacher informed petitioner that he was going to have to lay him off. According to Schumacher, petitioner, who was no longer working for the New York City Transit Authority at that time, was "depressed" and "upset" by the news (1026). At lunch that day, petitioner, who had previously mentioned that he was seeing a psychiatrist, joked that he now had something to talk about during his appointment that night (1028). Petitioner also started "really going off on [Rivera],"

8

telling Schumacher that he "[c]ouldn't take her, couldn't stand her" and wished that she were dead (1027). When Schumacher jokingly asked, "[W]hy don't you just have her killed or do it yourself?" petitioner replied that he would be the first person the police would suspect (1027). During that same conversation, petitioner talked about the amount of death benefits he would receive if Rivera were killed, saying he would receive approximately $300,000 if she died in the line of duty and a lesser amount if she died off-duty. Schumacher, who nonetheless thought petitioner was "a terrific guy" (1031), never contacted the police with respect to any of petitioner's threats because he "had heard it a thousand times before" (1032).

Second, petitioner missed a court date in Kings County Criminal Court that morning. At that proceeding, a pre-trial suppression motion was denied and a bench warrant was issued for petitioner's arrest. Petitioner's lawyer promptly contacted him about the warrant and petitioner went to court alone that afternoon to request that the warrant be vacated. Although the Criminal Court Judge continued petitioner's bail, he denied petitioner's request to adjourn the matter until late February. Rather, the judge instructed petitioner to tell his lawyer to return on January 22, 1996, saying, "then we will be ready to proceed" (1122).

That evening, petitioner made several calls to Rivera's house and to Lewis, her attorney. Although Lewis initially refused to take his calls, petitioner eventually managed to speak with her by calling her home just before midnight. According to Lewis, petitioner initially seemed "very distraught" (865) or "very despondent" (867). Thereafter, in a conversation lasting almost 50 minutes, petitioner told Lewis that his "motion to dismiss" the Criminal Court charges had been denied, and that he expected to go to jail (866). He asked Lewis to "have [Rivera] drop the charges," and offered to give the gun back if Lewis could "get [Rivera] to bring the baby to me

9

[and] arrange some visitation" (866, 868). Petitioner also wanted Rivera to drop the divorce proceedings and to agree to see him. Lewis testified that, "[w]hen [she] refused to agree to [petitioner's] demands[,] he got extremely violent" (868). He repeatedly threatened to kill Rivera with the gun.

At trial, Lewis testified that petitioner called her again about 10:00 the next morning, and they spoke for another 10 minutes. Petitioner claimed that he had spoken to Rivera, who refused to drop the charges or to arrange unsupervised visitation. He told Lewis that she "should talk to [Rivera]," and repeated his threat to kill her with the gun (870).

Rivera called Lewis almost immediately after Lewis's conversation with petitioner ended, and Lewis told Rivera about the conversation. Although Lewis recounted petitioner's threats, neither Rivera nor Lewis took them seriously. To the contrary, Lewis recalled:

> [W]e were laughing because he ... was always threatening and
> harassing her, and he was being ridiculous at this point (880).

Lewis advised Rivera that she was within her rights to deny him visitation that weekend, and recommended that Rivera not deviate from the custodial arrangements. Rivera indicated that she would follow that recommendation.

Telephone records introduced at trial corroborated that petitioner had called Lewis on January 13, 1996, albeit not around 10:00 a.m. as she had claimed. These same records indicated that petitioner placed 13 calls to Rivera's house between 10:48 a.m. and 7:40 p.m. that day, including four calls between 4:23 and 4:59 p.m. which lasted a total of over 20 minutes.

Petitioner's neighbor, Yuriy Margulis, may have overheard the last of these four calls. Around 5:00 p.m., Margulis, a computer programmer, was working in his basement computer

room, which shared a common wall with petitioner's apartment, when he heard petitioner talking very loudly and aggressively to someone named "Kim" (920-23). Margulis heard petitioner say, "Kim, don't do it to me" (922), and ask with whom she was going out that day. Margulis assumed petitioner was talking on the telephone because he could not hear the other end of the conversation and because petitioner said, "Don't hang up on me" (923). The conversation then ended abruptly.

Although it unclear whether she told petitioner, Rivera had made arrangements to go to the Staten Island Mall with her friend, Ellen Morck, that evening to exchange some Christmas gifts. However, when Rivera called Morck around 6:45 p.m., Morck was in the middle of dinner and told Rivera that she could not join her. At exactly 6:45 p.m., someone using Rivera's home telephone called petitioner's number and spoke for 32 seconds.

Rivera's mother, Mrs. Cassas, testified that she saw Rivera about 6:00 or 6:30 that evening, as she was "going downstairs to go outside" (516). The telephone rang before Rivera left, however, and Rivera loudly told whoever called that she was going to the Staten Island Mall However, the evidence adduced at trial suggested that Rivera may not have gone to the mall, or may have gone to see petitioner beforehand. Telephone records indicate that someone used the telephone in Rivera's house to call petitioner at 7:17 p.m., and that petitioner called Rivera's house three times between 7:36 and 7:40 p.m. On the last occasion, petitioner stayed on the line for over 10 minutes. Sometime later, Rivera' mother and sister found the items that Rivera was supposedly going to the mall to exchange, still in her room.

According to Andrea Sorrentino, the Brooklyn South Homicide detective who worked on this case, the police were never able to determine where Rivera went after she left her house that

11

evening. Yet, it is clear that, sometime before 10:00 p.m., Rivera drove to Bay 11th Street between Bath and Benson Avenues, where she parked on the curb opposite petitioner's apartment. There were no witnesses to the shooting that followed, but four witnesses testified concerning events immediately preceding and following the shooting. Since their testimony is inconsistent, this Court will discuss each witness's testimony separately.

### *The Shooting*

Margulis, one of two witness to the incident who was called by the prosecution, testified that he was sitting in the front room of the first-floor portion of his apartment at around 10:00 p.m. on January 13, 1996, when he heard a woman "desperately" screaming for help (925). Margulis recalled that the screams were "very loud," as if "[i]n a horror movie" (926). Margulis immediately went outside to the sidewalk, and walked three to five steps towards Benson Avenue. He heard the woman continue to scream for help, and heard a voice he recognized as petitioner's saying, "Don't do it. Don't do it" (928). However, Margulis could not see either person, since they were behind a vehicle which was parked at an angle in the middle of the street.

Margulis then heard a bang. Although he was not sure that it was a gunshot, Margulis immediately ran home, drew down the shades, and called 911. Thereafter, he peeked out the window to see petitioner walking towards the back of the car on the driver's side. He then saw petitioner take a baby from the back seat of the vehicle.

Peter Liuzzo, a defense witness, testified to a different version of the conversation that preceded the shooting. Liuzzo was a retired nurse anesthetist, who lived alone in a basement apartment at 119 Bay 11th Street, two doors from petitioner. Around 10:00 p.m. on January 13, 1996, while in the process of preparing for bed, he heard loud, angry voices coming from the

12

street. Although he could ascertain that one of the voices was male and one was female, Liuzzo could not hear what they were saying.

Dressed in his underwear, Liuzzo went to the front door and up one or two of the steps leading to street level. From there, he saw a vehicle parked "askew" with its front headed towards the opposite sidewalk and its back "towards [his] home" (1274-75). Liuzzo did not see anyone, but the lights were on and the motor was running. Suspecting that there might have been an automobile accident, Liuzzo yelled, "Are you okay? Does anyone need help?" (1275). When no one responded, he returned to his apartment.

As soon as he went inside, however, the voices resumed, "louder and angry" (1275). Although he still could not make out what they were saying, Liuzzo went to the door again and called 911 on his portable telephone. Liuzzo did not reach an operator, but heard a recording informing him that all lines were busy. When he hung up the telephone, Liuzzo was able to hear what the people were saying. At trial, Liuzzo testified that he could

> hear clearly a man saying, "[N]o Kim, don't do it." And then the
> voices change. They modulated, and woman says something to the
> effect, "I can't take it anymore. I'm really going to do it this time.
> This time I'm really going to do it" (1276).

To Liuzzo, it sounded as if the man was "begging," and the woman was "threatening" (1276).

Liuzzo called 911 again, and reached an operator with whom he had difficulty communicating. He never heard a shot or saw a gun. However, while speaking with the operator, Liuzzo looked outside to see a man walking from the back of the car towards the front. He also saw a "female figure on the opposite side towards the hood" or "the front door" of the car (1277).

13

Although Liuzzo did not recognize either person at the time, he later recognized the man as his neighbor, petitioner.

When he was questioned at his home in the early morning hours of January 14, 1996, Liuzzo told police that the woman had referred to the man as "George" (1288, 1291). He also recalled hearing her tell the man to "Get away from [her]" and to "Leave [her] alone" (1291). However, Liuzzo, whose wife had been hospitalized for depression and had contemplated suicide herself, told both the 911 operator and the police that he thought the woman was trying to kill herself. He was still of that view at the time of trial, testifying, without objection:

> I also have a psychiatric history in that I'm [a] registered nurse
> trained at Brooklyn State Hospital. And I have talked to people
> who are at the extreme edge of emotions for that particular moment.
> The change in voice in this lady from a combative woman
> defending herself, asserting herself, to a woman who had just
> resigned herself and given up. And say I am going to do it this time.
> I am really gonna do it this time. Based on my little experience in
> life, I think the woman was destructive (1299).

Another defense witness, Christopher Iacona, did not hear any conversations, but testified that he saw a gun shortly before the shooting. Iacona was watching television in the second-floor living room of his mother's house at 111 Bay 11th Street at around 10:00 p.m. on January 13, 1996, when he heard "a commotion outside" (1344). He did not look outside immediately, thinking that it "was kids playing in the snow" (1344). After "[a] couple of minutes," however, the commotion grew louder, prompting him to look out of the living room's full length double glass doors onto Bay 11th Street (1344). There, he saw a car parked diagonally, with its front pulled towards the far curb.

14

From a distance of about 50 feet, Iacona could see a man on the far side of the car, dressed in a red and blue jacket. The man was using both hands to hold the arm of someone who was holding a gun. Iacona could only see the arm of the person who held the gun and therefore assumed that that person was on the ground. The two people "seemed to be going back and forth" (1344), and Iacona believed that they were struggling for the gun (1354).

When he saw the gun, Iacona moved away from the window and told his mother, who was then in the kitchen, to call the police. A minute or two later, he heard "a muffled pop" (1344). He looked outside again and saw the man pacing back and forth behind the car, seemingly "very distraught" (1345). About that time, a Lincoln drove up and someone Iacona identified – perhaps mistakenly – as the driver exited. According to Iacona, the man "confronted" the driver, but the driver "didn't seem like he wanted to be bothered" (1345). The man then walked up the street towards Iacona's mother's house, at which point Iacona recognized the man as petitioner. Iacona knew that petitioner lived on the block, having occasionally talked to him about motorcycles.

Although Iacona was unsure whether the Lincoln was a "car service" vehicle, a prosecution witness, Michael Marziliano, testified that he and a friend, Frank Diaz, took car service to Bay 11th Street that night in an attempt to see a female friend who lived on the block. They arrived around 10:00 p.m. to find a car parked "sort of perpendicular" to the sidewalk, with the front of the car "pulled in" towards the curb (78). While Diaz exited the vehicle to see if their friend was home, Marziliano remained in the car and observed a man near the angled vehicle. When Marziliano first saw him, the man was bent over near the front fender on the driver's side. Although he could only see the man's back, Marziliano could hear the man say, "Oh, God, oh, God" (84).

15

Marziliano continued to watch the man for the three or four minutes it took Diaz to ascertain that their friend was not home. During that time, the man straightened up and walked around to the passenger side of the angled car. As Diaz returned to the car service vehicle, Marziliano exited and walked towards the angled car, thinking that the car might have "hit a dog or something" (84). Instead, he saw a woman lying face-up on the ground, roughly parallel to the car, with her head and chest resting on a pile of snow near the curb. She was still breathing; Marziliano could see her chest moving and could see her breath in the cold winter air. When he bent over to see if he could help, Marziliano noticed that her right hand was wrapped around the grip of an "automatic" pistol. Although Marziliano could not see if her finger was on the trigger, he testified that the gun was laying on her lower chest, pointed towards the car.

Although the man said, "Somebody help me," at some juncture (92), he never asked Marziliano to call 911. Indeed, when Marziliano and Diaz approached the car, he was on the other side of the vehicle removing a baby from the back seat. He then handed the baby to a woman. Marziliano remained at the scene until the police arrived and, after taking his information, asked him to return to his car service vehicle.

### The Investigation

Police Officers Jason Wexler and Bruno Valenti, both of the 62nd Precinct, were among the first officers to respond to the scene. At trial, Wexler recalled walking around to the driver's side of the angled vehicle to find a woman – later identified as Rivera – lying at a 45 degree angle in the snow, with a gun in her hand and her finger on the trigger. Valenti testified that he arrived to find a bluish car pulled over towards the left curb in the middle of the block and a man with a crying child on the left sidewalk. Valenti observed that Rivera's index finger was "through the

trigger guard [and] on the trigger" (320), and that the firearm was "cocked" in that the "hammer was back" (317). Afraid that it might discharge accidentally, Valenti removed the gun from Rivera's grip.

At the time Valenti arrived, Rivera was still breathing. Valenti ascertained that she still had a pulse and called an ambulance. Once the ambulance arrived, a sergeant instructed Wexler to accompany Rivera to the Victory Memorial Hospital. Petitioner was taken to 62nd Precinct.

Since Valenti was uncertain precisely how to make the weapon safe, he held it in his hand until Police Officer Anthony Mangiaracina of the Emergency Services Unit ("ESU") arrived. At trial, Mangiaracina testified that the gun he was handed by Valenti was a Beretta 92f and "was in a ready mode to be fired," meaning "[i]f the trigger were ... depressed the hammer would strike the firing pin" and the gun would have discharged (346). After removing the magazine and ejecting a bullet from the chamber by pulling back on the slide, Mangiaracina gave the gun to Valenti to voucher and began searching the snowy crime scene for other ballistics evidence.

The search proved difficult because the melting snow had created puddles three to five inches deep near the body. Mangiaracina cleared an area of pavement near the rear of the angled car, then shoveled snow and slush onto the pavement and used rakes and brooms to search through the snow. Using this method, he recovered one shell casing and two live cartridges. However, because of the manner in which the search was conducted, Mangiaracina could not identify the precise spot from which the ballistics evidence was recovered.

The Beretta and ballistics evidence were given to Detective Shawn McNerney of the Crime Scene Unit ("CSU"), who arrived at the crime scene at approximately 11:45 on the night of

17

January 13, 1996. McNerney observed that the gun had both gunshot residue and blood inside the barrel. Later, McNerney processed the gun for fingerprints, but was unable to lift any prints.

### *Petitioner's Version of Events*

As the police processed the crime scene, Sorrentino interviewed petitioner at the 62nd Precinct. Sorrentino, the Brooklyn South Homicide detective who was assigned to assist the case detective – Sean Dolan of the 62nd Precinct Detectives Unit – in investigating the incident, arrived at the precinct about 10:55 p.m. on January 13, 1996, to find petitioner bent over with his head down, crying, and rocking back and forth. Although Sorrentino had been told that the shooting appeared to be self-inflicted, petitioner was inside a holding cell in the second-floor squad office. When Sorrentino "asked the officer who was standing there why he was in [the cell]," the officer replied, "I put him in there because I was afraid he was going to do something to himself" (626).

After Sorrentino apologized to petitioner and released him from the cell, petitioner gave Sorrentino a lengthy, rambling statement. Petitioner first described his relationship with Rivera, admitting that "it got ugly after the birth of the child" (630). He then gave his version of the incident, in which he alleged that Rivera had committed suicide.

Petitioner told Sorrentino that Rivera dropped Michael off at his house around 8:00 on the evening of January 13, 1996, and had gone to the mall, leaving petitioner to take care of the baby alone. Two hours later, a visibly depressed and very emotional Rivera returned to petitioner's apartment, where she told petitioner that she was sorry about having to testify against him and that she could not "take it" anymore (633). Petitioner attempted to comfort her before he escorted Rivera and the baby outside to Rivera's car.

18

As petitioner was placing the baby in the back seat on the passenger's side, Rivera entered the driver's door and emerged with a gun. Petitioner ran around to the driver's side, where Rivera was standing with a gun pressed to her head, just behind her ear. Petitioner begged her repeatedly, "Don't do it," but Rivera said she was "gonna do it" because she could not "take it anymore" (635). Petitioner then twice attempted wrest the gun from Rivera but, each time, she thwarted his attempts by pointing the gun at him and scratching his face with her outstretched left hand. Before petitioner could make a third attempt to secure the weapon, Rivera shot herself. According to Sorrentino, petitioner blamed himself for being "too controlling" (662), but claimed that he had never stolen the Beretta, saying Rivera had possessed the gun "all along" (663).

In the early morning of January 14, 1996, petitioner gave a slightly different version of the incident to his friend, Police Officer John Torres. Although petitioner's account to Torres was largely consistent with what he told Sorrentino, petitioner told Torres that he dropped to his knees and begged Rivera to shoot him, not herself, just before the shot was fired. Petitioner claimed that he was still on his knees when Rivera shot herself. Torres testified that petitioner admitted that he did not try to help Rivera thereafter, saying he that he was "disoriented" and "in shock that something like this happened" (1049).

### The Medical Evidence

Rivera was still alive when she arrived at Victory Memorial Hospital at 10:37 p.m., but was pronounced dead sometime after 1:00 a.m. on January 14, 1996. When she died, CSU Detective Walter Lopez was already at the hospital to photograph her wounds. According to Lopez, Rivera had a gaping wound on the top right side of her head; small cuts on her chest, her breast, the back and inner side of her left hand, the middle finger of her right hand, and the left

19

side of her face; and bruises on her shins, her nose, her lips, and the side of her face. In addition, Lopez observed and photographed a dark black or grey smudge on the knuckle of Rivera's right thumb.

Suspecting that the smudge might be gunshot residue, Lopez used gunshot residue kits to lift samples from Rivera's hands and face. These kits were subsequently sent to the Connecticut State Police Forensic Science Lab, which had a scanning electron microscope that could be used to detect the presence of gunshot residue. According to Robert K. O'Brien, who performed the tests, the sample taken from Rivera's right hand tested positive for residue. The other samples proved negative.

In the early afternoon of January 14, 1996, First Deputy Chief Medical Examiner Jonathan Arden performed an autopsy on Rivera's body. Arden testified that the bruises on Rivera's shins were at least days old, but that the injuries to Rivera's face and hands were "fresher" (118). He opined that most of these were "blunt force injuries" – "injuries that occur from either impact or scraping type forces" (199). In addition, Arden opined that these injuries were "consistent with ... several punches or blows with an object" (132) and could have been caused in a fight, but could not all have been caused by a single fall (131-32).

Arden testified that the cause of death was a gunshot, which entered Rivera's head at the top of her right temple and gouged a trench into the surface of her scalp before entering her brain. There, the bullet carved a four-inch path through the brain, heading slightly downwards and towards the back of the head. At the end of that path, Arden recovered two bullet fragments: a copper-colored metal of the sort "typically ... used to form a coating or jacket of some bullets" and

a "gray softer metal which is usually based on lead which forms the central portion of these jacketed bullets" (142).

Based on the physical evidence, Arden believed that the bullet was fired at a "very shallow" angle relative to Rivera's head (141), and that a portion of the muzzle was touching the skin surface when the gun was fired. However, recognizing that the location and the trajectory of the wound were consistent with a self-inflicted injury, Arden was not prepared to offer a final opinion as to the manner of death immediately following the autopsy. Rather, Arden requested that Detective James Gannalo of the NYPD's Ballistics Squad run certain tests with respect to the soot on the knuckle of Rivera's right thumb.

On January 16, 1996, Gannalo received and examined the Beretta .9 millimeter semiautomatic pistol which had been recovered from Rivera's hand, along with the ballistics evidence which had been recovered from the scene by Mangiaracina and the fragments which had been recovered from Rivera's brain. Gannalo found that the magazine in the Beretta had a capacity of 15 rounds and still contained 12 cartridges. He conducted a microscopic analysis of the weapon and the ballistics evidence, and determined that the copper jacketing, the spent shell casing, and the two live cartridges had all come from the Beretta. With respect to the live cartridges, Gannalo testified that these had been manually ejected through the ejector port on the top of the weapon when someone either pulled on the back of, or pushed on the front of, the slide surrounding the barrel. According to Gannalo, these cartridges could have been ejected from the weapon regardless of whether the safety was off or on.

In addition to performing tests to confirm that the Beretta was, in fact, operable, Gannalo did pattern tests to determine the distribution of gunshot residue from the weapon when it was

21

fired. In the course of these tests, Gannalo fired the gun 20 times, each time wearing a new white cotton glove, in an effort to determine if the soot on Rivera's thumb could have been deposited when she fired the weapon. Although flecks of residue appeared on the trigger finger in three of the 20 tests, the thumbs of the gloves remained pristine. However, Gannalo always fired the gun in the "traditional right-handed manner," with his thumb around the back of the gun (838).

Gannalo attributed the lack of residue emanating from the ejector port to the design of the weapon itself. According to Gannalo, the Beretta was designed to have a "delayed blow-back," meaning that the slide and barrel would recoil together immediately after the gun was fired. At some juncture, the barrel would stop and the slide would continue recoiling, causing the ejector port to open. By then, however, the bullet would have left the barrel, along with "the vast majority if not all of [the] gunshot residue" (797-98).

After learning of the results of the pattern tests at a meeting with Gannalo on the afternoon of January 17, 1996, Arden "believed at that point that [Rivera's] was not a self-inflicted gunshot wound" (165). Arden nonetheless waited for the results of further laboratory tests – most notably, the test confirming that the residue on Rivera's right thumb was, in fact, gunshot residue – before certifying a manner of death in early February 1996. However, Arden's opinion that Rivera's shooting was a homicide was not based solely on his belief that Rivera could not have gotten a smudge on her right thumb while shooting herself with her right hand. It was also based on his belief that she could not have maintained a grip on the gun after sustaining the shot to the head.

At trial, Arden's testimony was controverted by the testimony of a defense expert, Donald Jason, a medical professor who taught forensic pathology at a medical school in Winston-Salem, North Carolina. Jason testified that Rivera's injury might have caused a reflexive tightening of

the muscles in Rivera's hand, enabling her to hold onto the gun following the shooting. In addition, Jason testified that it was not "extraordinarily unlikely" that Rivera could have gotten residue on her hand while shooting the gun, noting that the gun was in contact with Rivera's head and theorizing that the residue could have been forced back into the muzzle and out of another "port on the gun" (1194). Jason also testified that the bruises and lacerations Rivera suffered could have been caused in a struggle over the gun, but claimed that her black eyes were caused by internal bleeding following the shooting. However, Jason admitted that the bruising below Rivera's left eye was more severe than the bruising on the right side – the side on which the bullet entered.

### The Searches

By the afternoon of January 14, 1996, the police had already obtained a warrant to search petitioner's apartment for any evidence relating to the Beretta. About 2:30 that afternoon, case detective Dolan and Detectives Patrick Boyle and Joseph Fazio executed the warrant and uncovered a host of items relating to the handgun. Dolan searched petitioner's kitchen cabinets and found, *inter alia*, a magazine, a magazine holder and rubber handgrips for a .9 millimeter Beretta.[3] Meanwhile, Boyle searched a closet and discovered an instruction booklet and warranty card for the Beretta itself. In addition, Boyle discovered 23 rounds of .9 millimeter ammunition.

The grey Ford Taurus which Rivera had been driving on the night of the shooting was taken to the 61st Precinct garage, where CSU Detective Michael D. Sheptuk dusted it for fingerprints and conducted an inventory search. Although no usable prints were discovered,

---

[3]On cross-examination, Dolan testified that the magazine may have worked on guns other than the Beretta. Similarly, the "magazine holder" – a case that hooks onto a belt and is designed to hold a magazine – could have held other magazines.

Sheptuk found a fanny-pack holster stuffed underneath the driver's seat. According to Sheptuk, this holster, which was capable of holding the Beretta, was pushed completely underneath the driver's seat and was not visible upon casual inspection.

Sheptuk opened the fanny-pack holster in order to see if it contained either a weapon or any evidence of who owned it. Although it contained neither, it contained pens and slips of paper. According to James McCafferty, the Brooklyn South Homicide Detective who vouchered the contents of the fanny-pack holster, the slips of paper included "senior citizen discount tickets" (1114), apparently issued by the New York City Transit Authority. However, Cassas testified that she, not Rivera, owned the Taurus and that other items found in the car may have belonged to Cassas's boyfriend, who worked for the Transit Authority.

### The Summations, Charge and Verdict

At the close of the People's case and again at the close of the evidence, defense counsel moved to dismiss the charge of depraved indifference murder on the ground that there was no evidence supporting the view that the shooting was reckless, rather than intentional. In opposition to the second of these motions, the prosecutor argued that "the act of taking a loaded gun and placing it to [Rivera's] head, even without the intent to kill, would constitute a reckless disregard for ... life" (1260). Defense counsel's motions were denied.

At the charge conference, discussions focused primarily on the prosecution's request that the jury be charged on the lesser included offense of manslaughter in the first degree, under the theory that petitioner had acted with an intent to cause serious physical injury rather than an intent to kill. Although defense counsel argued that there was no view of the evidence that would permit the jury to find intent to cause serious physical injury, defense counsel did not repeat the argument

24

regarding depraved indifference murder. Indeed, when the prosecutor implied that evidence of a struggle for the gun could support a finding of intent to cause serious physical injury, defense counsel retorted, "I believe the struggle would go to depraved indifference murder" (1417).

Although Justice Hall ultimately agreed to charge the jury on manslaughter in the first degree, the prosecutor's summation contained no arguments relating to that charge or to depraved indifference murder. Rather, the prosecutor, responding to defense counsel's arguments that Rivera had shot herself, argued only that the shooting was intentional murder and not a suicide.

The jury was charged on eight counts. The first five related to the shooting and the last three related solely to the September 8, 1995, incident in which petitioner was alleged to have assaulted Rivera. Justice Hall charged the first five counts – the two counts of murder in the second degree, manslaughter in the first degree, and criminal possession of a weapon in the second and third degrees – in the alternative, instructing the jury: "The first time you find him guilty of any of the first five, then you go on immediately to the ... last three counts" (1566).

On the afternoon of July 15, 1997, after a lengthy deliberation during which one of the jurors was hospitalized with chest pains, the jury acquitted petitioner of intentional murder and convicted him of depraved indifference murder. In addition, the jury convicted petitioner of all three offenses relating to the September 8, 1995, incident: criminal contempt in the second degree (for violating the order of protection), menacing in the third degree and harassment in the second degree. On September 19, 1997, after denying a post-verdict motion to dismiss the murder conviction on the ground of insufficiency of the evidence, Justice Hall sentenced petitioner to an indeterminate term of 23 years to life imprisonment on the murder count, and to lesser, concurrent terms on the remaining three counts.

*The Appeals*

On direct appeal, petitioner argued, *inter alia*, that the evidence was insufficient to support

the conviction for depraved indifference murder. Citing to *Jackson v. Virginia*, 443 U.S. 307

(1979), petitioner argued that "[t]here was no reasonable view of the evidence that this act was

anything but an intentional shooting, either homicide or suicide." Brief for Defendant-Appellant

at 39. This argument was rejected by the Appellate Division of the Supreme Court of the State of

New York, which affirmed petitioner conviction. In an opinion dated December 29, 2003, the

Appellate Division ruled:

> Viewing the evidence in the light most favorable to the prosecution
> ..., we find that it was legally sufficient to establish the defendant's
> guilt of depraved indifference murder beyond a reasonable doubt
> (*see People v Sanchez*, 98 N.Y.2d 373 (2002) ...). Moreover, upon
> the exercise of our factual review power, we are satisfied that the
> verdict of guilt was not against the weight of the evidence ....

*People v. Rivera*, 2 A.D.3d 884, 884 (N.Y. App. Div. 2003) (internal citations omitted).

Petitioner application for leave to appeal this decision to the New York Court of Appeals was

denied on April 14, 2004. *See People v. Rivera*, 2 N.Y.3d 764 (2004).

On April 4, 2005, petitioner commenced this action, seeking a writ of habeas corpus

pursuant to 28 U.S.C. § 2254. The petition raised a single question: "Whether the state courts

unreasonably applied the rule of *Jackson v. Virginia* requiring proof beyond a reasonable doubt to

prove a conviction when they found that the evidence was legally sufficient to support a finding of

reckless and depraved conduct in this case where all of the evidence went to a theory of

intentional conduct." For the reasons stated below, this Court answers that question in the

negative.

## DISCUSSION

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") sets forth the standard of review applicable to this case. For claims that have been fully adjudicated on the merits in state court, a petitioner must show that the state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.§ 2254(d). Under the terms of § 2254 (d)(1), habeas relief is warranted "only upon a showing that the state courts unreasonably applied clearly established *Supreme Court* precedent." *Mask v. McGinnis*, 252 F.3d 85, 90 (2d Cir. 2001) (per curiam) (emphasis in original).

The Supreme Court has long recognized "that the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson v. Virginia,* 443 U.S. 307, 315 (1979) (quoting *In re Winship,* 397 U.S. 358, 364 (1970)). Thus, a § 2254 habeas petitioner who challenges the sufficiency of the evidence underlying his state court conviction "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson,* 443 U.S. at 324. However, "[f]ederal courts are not forums in which to relitigate state trials," *Barefoot v. Estelle,* 463 U.S. 880, 887 (1983), and a habeas court is not permitted "to make its own subjective determination of guilt or innocence." *Herrera v. Collins,* 506 U.S. 390, 401 (1993) (quoting *Jackson,* 443 U.S. at 320, n.13). Rather, "the relevant question

27

is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (emphasis in original).

In this case, petitioner, citing to *Jackson*, asserts that his Fourteenth Amendment due process rights were violated because the evidence adduced at his State court trial was insufficient to prove beyond a reasonable doubt that he was guilty of depraved indifference murder. "When it considers the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000) (quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999)). Accordingly, this Court must first examine state law to ascertain the elements of depraved indifference murder.

### The Elements of Depraved Indifference Murder

Depraved indifference is one of several theories of murder in the second degree defined in section 125.25 of the New York Penal Law. The depraved indifference theory is set forth in Penal Law § 125.25(2), which provides that a person is guilty of murder in the second degree when:

> [u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person.

This subdivision has remained unchanged from the date of its enactment in 1967 to the present. *See People v. Sanchez*, 98 N.Y.2d 373, 395-96 (2002) (describing the historical development of depraved indifference murder).

Although the statutory language has remained the same, the law regarding depraved indifference murder has changed markedly over the last seven years. The recent developments in

28

depraved indifference jurisprudence were recounted at length in two 2006 opinions by the New York Court of Appeals: *People v. Feingold*, 7 N.Y.3d 288 (2006), and *Policano v. Herbert*, 7 N.Y.3d 588 (2006). For purposes of this opinion, the latter opinion – which, for reasons discussed below, is hereafter called "*Policano IV*" – is particularly instructive.

In *Policano IV*, the New York Court of Appeals explained that, in order to convict a defendant of depraved indifference murder in 2001, the prosecution was required to prove beyond a reasonable doubt that the defendant "(1) recklessly engaged in conduct (2) which created a grave risk of death to another person (3) thereby causing the death of another person (4) under circumstances evincing a depraved indifference to human life." *Id.* at 602. According to *People v. Register*, 60 N.Y.2d 270 (1983) – which was then the most recent New York Court of Appeals decision on depraved indifference murder – the actus reus proscribed by the depraved indifference statute was "engaging in conduct which creates a grave risk of death to another person." *Register*, 60 N.Y.2d at 276. The mental state required for depraved indifference murder was recklessness – a "conscious disregard of a substantial risk." *Id.* The *Register* Court recognized that depraved indifference murder "resemble[d] manslaughter in the second degree (a reckless killing which includes the requirement that defendant disregard a substantial risk)," but found that the crimes were distinguished by the requirement that a depraved indifference murder "occur '[u]nder circumstances evincing a depraved indifference to human life.'" *Id.* (internal citations omitted).

Under *Register*, proof of a one-on-one shooting was viewed both as "compelling circumstantial evidence of intent to cause death" and evidence of circumstances evincing a depraved indifference to human life. *Policano IV*, 7 N.Y.3d at 599. Since questions concerning a defendant's mental state at the time of the murder were considered to be "a classic matter for the

29

jury," *id.*, New York trial courts routinely charged the jury on both intentional and depraved indifference murder in cases involving one-on-one shootings. As the Court of Appeals explained:

> [W]here both intentional and depraved indifference murder were charged in one-on-one shootings or knifings, [both] counts were submitted to the jury for it to sort out the defendant's state of mind unless there was absolutely no evidence whatsoever that the defendant might have acted unintentionally.

*Id.* at 600-01.

*People v. Sanchez*, 98 N.Y.2d 373 (2002) – the first depraved indifference murder case considered by the New York Court of Appeals following *Register* and one of the cases cited by the Appellate Division in affirming petitioner's conviction, *see Rivera*, 2 A.D.3d at 884 – serves as a good example of how *Register* was applied. In *Sanchez*, the evidence established that the defendant had fired the fatal shot into the chest of the deceased from a distance of no more than 12 to 18 inches. Although this was strong circumstantial evidence of intent to cause death, the jury acquitted Sanchez of intentional murder and convicted him of depraved indifference murder. On appeal, Sanchez argued that the evidence was consistent only with intentional murder, and that there was no view of the evidence that would permit a finding that Sanchez acted recklessly. Sanchez also argued that there was no evidence of "circumstances evincing a depraved indifference to human life."

The Court of Appeals rejected both arguments. First, viewing the evidence in the light most favorable to the prosecution, the Court concluded that "a rational jury could harbor a reasonable doubt that the homicide ... was intentional.'" *Sanchez*, 98 N.Y.2d at 377. The Court noted that, "[a]lthough the gun was discharged at point-blank range, the bullet only struck [the deceased] in his upper left chest," and reasoned that the jury might "also have taken into account

30

the preexisting good relations between [Sanchez and the deceased], and concluded that this was an instantaneous, impulsive shooting – perhaps to disable or frighten ... rather than to kill ...." *Id.* at 377-78. Based on this evidence, the Court of Appeals held that "a jury reasonably could have found that defendant's homicidal level of mental culpability was reckless rather than intentional." *Id.* at 378.

With respect to Sanchez's second argument, the Court of Appeals held that the evidence of a point-blank shooting was itself sufficient to support a finding that Sanchez acted under circumstances evincing a depraved indifference to human life. The *Sanchez* Court stated:

> [A]ccepting the jury's determination that the killing ... was not intentional, ... defendant's shooting into the victim's torso at point-blank range presented such a transcendent risk of causing his death that it readily meets the level of manifested depravity needed to establish murder under Penal Law § 125.25 (2). Here, once it rejected intentional murder, the jury (which concededly was properly instructed) could reasonably conclude that defendant's conduct was so manifestly destined to result in ... death as to deserve the same societal condemnation as purposeful homicide.

*Id.* at 378. Thus, at the time *Sanchez* was decided in July 2002, "conduct involv[ing] such a high risk of death that it could also lead to the conclusion that it was intentional" could also be characterized "as evincing depraved indifference to human life." *Id.* at 384.

At some point post-*Sanchez*, the New York Court of Appeals' interpretation of the fourth of the four elements of depraved indifference murder – *i.e.*, the element requiring proof of "circumstances evincing a depraved indifference to human life" – "gradually and perceptibly changed from an objectively determined degree-of-risk standard (the *Register* formulation) to a mens rea." *Policano IV*, 7 N.Y.3d at 602-603. The Court of Appeals did not expressly overrule *Register* until July 2006, when it ruled in *Feingold* that "depraved indifference to human life," not

recklessness, was the mens rea in depraved indifference cases. *Id.* at 603. However, the four cases decided by the Court of Appeals between June 2003 and December 2005 – namely, *People v. Hafeez*, 100 N.Y.2d 253 (2003), *People v. Gonzalez*, 1 N.Y.3d 464 (2004), *People v. Payne*, 3 N.Y.3d 266 (2004), and *People v. Suarez*, 6 N.Y.3d 202 (2005) – reflect "a perceptible, evolving departure from the underpinnings of depraved indifference murder as expressed in *Register* and *Sanchez*." *Policano IV*, 7 N.Y.3d at 603.

It may not be possible to identify with exactitude the point at which the Court of Appeals abandoned the *Register/Sanchez* approach. *See id.* As the *Policano IV* Court noted, "individual [Court of Appeals] judges hold differing views as to where along this trajectory a majority of the Court may have effectively passed the point of no return – the limit beyond which, hard as we may have tried, it was simply not possible to reconcile our developing case law with *Register* and *Sanchez*." *Id.* However, it is clear that "[b]eginning with *Hafeez*, the *Register/Sanchez* rationale was progressively weakened so that it would no longer support most depraved indifference murder convictions, particularly one-on-one shootings or stabbings." *Feingold*, 7 N.Y.3d at 695-96.

In *Henry v. Ricks*, 578 F.3d 134, 139 (2d Cir. 2009), the Second Circuit indicated that the change in New York law may have occurred as early as March 2004, when the Court of Appeals held in *Gonzalez* that a defendant who shot the victim multiple times at close range was "not recklessly creating a grave risk of death, but was creating a virtual certainty of death born of an intent to kill." *Gonzalez*, 1 N.Y.3d at 468. For purposes of this opinion, it is not necessary to decide exactly when the law changed. Rather, it suffices to note that the law changed to such a degree that by October 2004, the Court of Appeals was stating that "a one-on-one shooting or

32

knifing (or similar killing) [could] almost never qualify as depraved indifference murder." *Payne*, 3 N.Y.3d at 272.

### *Retroactivity*

These drastic changes in the law relating to depraved indifference murder created instances in which issues concerning retroactivity and which law to apply could prove determinative in the habeas corpus context. Indeed, precisely such an instance occurred in *Policano* – a case involving a one-on-one shooting in which the defendant shot the deceased twice in the head, once in the neck, and once in the thigh. *Policano IV*, 7 N.Y.3d at 591. Policano's judgment of conviction became final on June 28, 2001, more than one year before *Sanchez* was decided. However, Policano's petition for a writ of habeas corpus was not adjudicated by the district court until September 7, 2004 – almost half a year after *Gonzalez* was decided.

Relying primarily on *Gonzalez*, the district court granted Policano's § 2254 petition, finding that Policano had been "convicted of recklessly causing a murder that, according to the evidence, he intentionally committed if he committed it at all." *Policano v. Herbert*, No. 02 CV 1462 (JG), 2004 WL 1960203, at *2 (E.D.N.Y. Sept. 7, 2004). A three-judge panel of the Second Circuit initially unanimously affirmed the district court's decision, relying on both *Gonzalez* and *Payne* – a case which had been decided shortly after the district court ruled but more than a year before the Second Circuit ruled. *Policano v. Herbert*, 430 F.3d 82 (2d Cir. 2005) ("*Policano II*"). The Second Circuit found that there was "no evidence in the record that Policano meant to threaten or frighten [the victim], that the gun fired accidentally, or that Policano acted otherwise than with the deliberate intent to kill." *Id.* at 89.

33

For reasons that are unclear, the Second Circuit never issued a mandate in *Policano II*. *Policano v. Herbert,* 507 F.3d 111, 113 (2d Cir. 2007) ("*Policano V*"). Rather, in *Policano v. Herbert,* 453 F.3d 75 (2d Cir. 2006) ("*Policano III*"), the same three judge panel which had decided *Policano II* elected to certify three questions to the New York Court of Appeals. The first and third of these are highly relevant to this case. The first question posed by the Second Circuit asked whether, on June 28, 2001 – the date Policano's conviction became final – New York law permitted a jury to convict a defendant of depraved indifference murder "where the evidence produced at trial indicated that if the defendant committed the homicide at all, he committed it with the conscious objective of killing the victim." *Policano III,* 453 F.3d at 76. The third question posed by the Second Circuit was whether *Payne* and *Gonzalez* "state[d] the correct interpretation of the law of New York with respect to the elements of depraved indifference murder on the date Policano's conviction became final." *Id.*

The New York Court of Appeals answered both of these certified questions in the negative. With respect to the first question, the Court stated that it had "never been permissible in New York for a jury to convict a defendant of depraved indifference murder 'where the evidence produced at trial indicated that if the defendant committed the homicide at all, he committed it with the conscious objective of killing the victim.'" *Policano IV,* 7 N.Y.3d at 600. However, after discussing *Register* at length, the Court noted that in 2001 the fact "[t]hat a defendant's acts virtually guaranteed the victim's death did not, in and of itself, preclude a guilty verdict on the theory of depraved indifference." *Id.* at 601. Rather, "the very facts establishing a risk of death approaching certainty and thus presenting compelling circumstantial evidence of intent – for

34

example, a point-blank shooting of the victim in the head – likewise demonstrated depraved indifference." *Id.*

The New York Court of Appeals interpreted the third question posed by the Second Circuit as "rais[ing] the question whether [the Court of Appeals'] post-*Sanchez* case law applies retroactively." *Id.* at 603. The New York Court of Appeals found that the purpose of the "new interpretation of 'under circumstances evincing a depraved indifference to human life' [was] to dispel the confusion between intentional and depraved indifference murder, and thus cut off the continuing improper expansion of depraved indifference murder." *Id.* Given that purpose, the Court found that "nonretroactivity pose[d] no danger of a miscarriage of justice." *Id.* at 604. To the contrary, the Court opined that "retroactive application would potentially flood the criminal justice system with CPL 440.10 motions to vacate convictions of culpable intentional murderers who were properly charged and convicted of depraved indifference murder under the law as it existed at the time of their convictions." *Id.* Accordingly, the New York Court of Appeals held that the post-*Sanchez* changes in the law relating to depraved indifference murder were not retroactive.

Based on the answers to these certified questions, the Second Circuit withdrew *Policano II* and reversed the district court's order granting Policano a writ of habeas corpus. Applying New York law as it existed between *Register* and *Sanchez*, the Second Circuit reasoned that the evidence was sufficient to support Policano's conviction for depraved indifference murder because the Court could not say "that no rational juror could have found beyond a reasonable doubt that Policano acted unintentionally." *Policano V*, 507 F.3d at 117. However, because Policano's trial took place well after *Register* was decided and Policano's conviction became final

35

before *Sanchez* was decided, the *Policano V* Court did not address the issue of precisely what date later courts should use in determining the state of New York's depraved indifference law.

### *The Relevant Date*

In the 26 months since *Policano V* was decided, the Second Circuit has not issued a reported opinion addressing this issue, but has touched upon the issue in two unreported summary orders: *Williams v. Phillips*, 307 Fed. Appx. 489 (2d Cir. 2008), and *Flowers v. Fisher*, 296 Fed. Appx. 208 (2d Cir. 2008). However, in both of these cases, as in *Policano V*, the trial occurred and the petitioner's conviction became final within the period between *Register* and *Sanchez*. Accordingly, there was no need in either case to determine precisely what date to use in determining what New York law applied to the habeas petition.

Moreover, *Williams* and *Flowers* offered inconsistent standards for determining the relevant date. *Flowers*, for example, stated, "We look to New York law as it existed at the time Flowers's conviction became final, as the New York Court of Appeals has found that although the law on depraved indifference has changed significantly in recent years, those changes do not apply retroactively." *Flowers*, 296 Fed. Appx. at 210. However, the Court then proceeded to examine the state of the law "at the time of Flowers's conviction." *Id.* In *Williams*, the Court stated, "The New York Court of Appeals currently applies a different interpretation of 'depraved indifference' murder; however, we must apply the law as it existed at the time of petitioner's trial and direct appeal." *Williams*, 307 Fed. Appx. at 490, n.2. Yet, in applying this standard, the *Williams* Court looked to the time Williams' conviction became final, saying, "Because petitioner's conviction became final in 2002, *Register* applies." *Id.*

36

In this case, unlike in *Policano*, *Williams* and *Flowers*, the date used to determine which version of New York law to apply may be determinative. Petitioner was tried in the summer of 1997, and was convicted on September 19, 1997 – well before *Sanchez* was decided. However, petitioner's judgment was not affirmed by the Appellate Division until December 29, 2003 – approximately 6 months after *Hafeez* was decided – and leave to appeal to the New York Court was not denied until April 14, 2004 – approximately three weeks after *Gonzalez* was decided. Accordingly, if this Court were to apply New York law as it existed at the time of conviction, *Register* would apply, as it did in *Policano*, *Williams* and *Flowers*. On the other hand, if this Court were to apply New York law as of the time petitioner's conviction became final on July 13, 2004 – 90 days after the New York Court of Appeals denied leave, *see Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) – this Court would have to apply *Gonzalez*.

This Court does not perceive any consensus among the district courts in this Circuit regarding which time frame to apply. Indeed, courts have cited *Williams* both for the proposition that courts "must look to New York law as it existed at the time petitioner's conviction became final," *Archer v. Fischer*, No. 05 CV 4990 (JFB), 2009 WL 1011591, at *14 (E.D.N.Y. April 13, 2009), and in support of the position that "the law to be applied in a habeas proceeding is 'the law as it existed at the time of petitioner's trial and direct appeal.'" *Reyes v. Smith*, No. 06-CV-3673 (SJF), 2009 WL 3734911, at *11, n. 11 (E.D.N.Y. Nov. 2, 2009). Since the case law of this Circuit appears unsettled, this Court will engage in its own evaluation of what date to apply in evaluating depraved indifference cases.

First, this Court is not persuaded that the Second Circuit, in asking the New York Court of Appeals to answer the certified questions as of the date Policano's conviction became final, meant

37

to hold that this was the appropriate date to use in determining what law to apply. In certifying the questions in *Policano III*, the Second Circuit did not explain why it chose to use the date Policano's conviction became final. However, this Court notes that the Second Circuit was then uncertain as to whether the post-*Sanchez* changes in the law applied retroactively. In fact, the third certified question essentially asked for resolution of this retroactivity question. *See Policano IV*, 7 N.Y.3d at 603. In light of this uncertainty, the Second Circuit would logically want to assume retroactively and use the latest possible date, in anticipation that the New York Court of Appeal would discuss the relevant prior cases in the course of answering the certified questions. Had the Second Circuit done otherwise – and asked only for the state of New York law at the time of petitioner's conviction – it would have risked the possibility that the Court of Appeals would hold that the changes in the law were retroactive, yet would have failed to define the law for the period between the date of conviction and the date the conviction became final.

Second, while the Second Circuit may have implied in *Policano II* that it was necessary to develop an "understanding the applicable law as it existed at the time of Policano's trial and appeal" in order to resolve that case, 430 F.3d at 92, this Court notes that *Policano II* has since been withdrawn. *Policano V*, 507 F.3d at 117. Moreover, the "time of ... trial and direct appeal" standard set forth in *Williams* would be unworkable, since it encompasses multiple dates: the date of conviction and the date of each relevant decision on direct appeal. The time period between conviction and direct appeal can be a period of several years. In this case, as noted above, the Appellate Division did not decide petitioner's direct appeal for more than six years following his conviction. Accordingly, even if the Second Circuit adhered to the "time of ... trial and direct appeal" standard, this Court could not apply that standard in deciding this case.

In contrast, it makes sense to apply the law that existed at the time petitioner was convicted. After all, in order to establish that the evidence is insufficient to sustain a conviction, a habeas petitioner must show that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324; *see Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). Moreover, because the changes in the law relating to deliberate indifference murder are not retroactive, *Policano IV*, 7 N.Y.3d at 603-04, appellate courts would have to apply the law that existed at the time of conviction. Accordingly, this law will apply the New York law as it existed on September 19, 1997 – the date of petitioner's conviction.

### *Application of the Register/Sanchez Standard*

As discussed above, *Register* was the controlling New York Court of Appeals decision in 1997. Under *Register*, "where both intentional and depraved indifference murder were charged in one-on-one shootings ..., [both] counts were submitted to the jury ... unless there was absolutely no evidence whatsoever that the defendant might have acted unintentionally." *Policano IV*, 7 N.Y.3d at 600-01. Even in the case of point-blank shootings, if there was any view of the evidence that permitted a reasonable juror to find that the murder was not intentional, New York courts accepted the jury's determination and treated the fact that the shooting was virtually certain to cause death as evidence of "the level of manifested depravity needed to establish murder under Penal Law § 125.25 (2)." *Sanchez*, 98 N.Y.2d at 378. Jury verdicts finding a defendant guilty of depraved indifference murder were overturned only where there was "no evidence in the record ... that [the defendant] acted otherwise than with the deliberate intent to kill." *Policano II*, 430 F.3d at 89.

39

In this case, there was evidence from which a reasonable juror could find that petitioner had recklessly, but not intentionally, caused Rivera's death. First, there was ample evidence that petitioner, not Rivera, had possessed the Beretta immediately prior to the incident. Beretta-related paraphernalia – including the instruction manual and warranty card for the weapon, along with the rubber grips similar to those which had been on the gun when Jones transferred it to Rivera – were found in petitioner's apartment during the January 14, 1996, search. Moreover, petitioner had called Lewis just before midnight on January 13, 1996, to offer to return the weapon if Rivera would, *inter alia*, drop the criminal charges against him.

Second, there was ample evidence that petitioner had struggled with Rivera before the fatal shot was fired. Iacona, the only witness to see either petitioner or Rivera immediately before the shooting, testified that he observed a struggle between petitioner and someone holding a gun. During the incident itself, two live cartridges were ejected from the gun as a result of the slide surrounding the barrel of the gun being either pulled or pushed back. While there was no evidence concerning what caused the slide to be moved in this manner, this evidence was entirely consistent with a struggle over the weapon.

In addition, both petitioner and Rivera sustained injuries suggesting that a struggle had occurred. When she interviewed petitioner at the 62nd Precinct on the night of the incident, Sorrentino observed fresh scratches on his face. Petitioner told Sorrentino that he had suffered these injuries during the incident. Rivera's face and body exhibited similar superficial lacerations and contusions. At the time of the autopsy, Arden himself speculated that these injuries might have been caused during a fight with someone wearing a ring.

On the other hand, there was only circumstantial evidence that the shooting had been an intentional murder. To be sure, there was evidence that petitioner had thrice threatened to kill Rivera during the 36 hours prior to the shooting. First, at lunchtime on January 12, 1996, petitioner told his employer, Paul Schumacher, that he wished Rivera were dead. Then, during a telephone conversation with Lewis on the night before the shooting, petitioner threatened to kill Rivera with the gun unless she capitulated to certain demands. Petitioner repeated the threat during a second conversation with Lewis the next morning.

However, there was also evidence that petitioner had threatened Rivera's life many times in the past but had never acted on those threats. In fact, neither Schumacher nor Lewis took petitioner's threats seriously. Schumacher testified that he had heard similar threats "a thousand times before" (1032), and Lewis testified that petitioner "was always threatening and harassing" Rivera (880). Lewis implied that even Rivera did not take the threats seriously, testifying that she and Rivera shared a laugh on the morning of January 13, 1996, as Lewis recounted petitioner's "ridiculous" statements (880). Indeed, Cassas testified that, at least until January 7, 1996, the door to Rivera's house was usually left unlocked (391).

Given the relatively weak circumstantial evidence of intentional murder, this Court cannot find that no reasonable juror could harbor a reasonable doubt that the homicide was intentional. A reasonable juror could find evidence to support the view that the gun had fired accidentally during a struggle over the weapon or when petitioner put the gun against Rivera's head in an attempt to frighten her. Accordingly, there was a view of the evidence supporting a finding of reckless, as opposed to intentional, homicide.

Assuming the jury adopted this view of the evidence, the jury could interpret evidence that the fatal shot was fired while the gun was in contact with Rivera's head as proof that the shooting occurred under circumstances evincing a depraved indifference to human life. As the New York Court of Appeals has itself noted, under *Register*, proof of a one-on-one shooting was viewed both as "compelling circumstantial evidence of intent to cause death" and evidence of circumstances evincing a depraved indifference to human life. *Policano IV*, 7 N.Y.3d at 599. The jury, having rejected intentional murder, could find that evidence of the point-blank shooting itself established "the level of manifested depravity needed to establish murder under Penal Law § 125.25 (2)." *See Sanchez*, 98 N.Y.2d at 378.

## CONCLUSION

For the reasons set forth above, the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied and this case is dismissed. Since petitioner has not made a substantial showing of the denial of a constitutional right, no certificate of appealability is granted with respect to petitioner's claim. *See* 28 U.S.C. § 2253(c)(2); *Lozada v. United States*, 107 F.3d 1011, 1017 (2d Cir. 1997) (discussing the standard for issuing a certificate of appealability), *abrogated on other grounds in United States v. Perez*, 129 F.3d 255, 259-60 (2d Cir. 1997).

**SO ORDERED.**

/ SANDRA L. TOWNES
United States District Judge

Dated: December *18*, 2009
Brooklyn, New York